AO-106 (Rev: 06/09)-Application for Search Warrant

# FILED

## UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

AUG 1 3 2025

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *409 South Maple Street, Unit B,* | ) | Case No. 25-mj-693-MTS |
| *Sapulpa, Oklahoma 74066 and* | ) | |
| *a gray Ford F150 bearing Oklahoma plate JSS-055,* | ) | **FILED UNDER SEAL** |
| *in Sapulpa, Oklahoma* | ) | |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachments "A" and "B"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment "C"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(viii)** | **Conspiracy to Distribute Methamphetamine** |
| **21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii)** | **Possession of Methamphetamine with Intent to Distribute** |

The application is based on these facts:

> **See Affidavit of SA Wyatt Huffman, DEA, attached hereto**.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Wyatt Huffman, Special Agent, DEA
*Printed name and title*

Subscribed and sworn to by phone.

Date: 8-13-2025

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Mark T. Steele, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

In the Matter of the Search of
409 South Maple Street, Unit B,
Sapulpa, Oklahoma 74066 and a gray
Ford F150 bearing Oklahoma plate
JSS-055, in Sapulpa, Oklahoma

Case No. _____

**FILED UNDER SEAL**

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Special Agent Wyatt Huffman, being first duly sworn under oath, depose and

state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search of 409 South Maple Street, Unit

B, Sapulpa, Oklahoma, Creek County, Northern District of Oklahoma as further

described in Attachment A, and a gray Ford F150 bearing Oklahoma tag JSS055

located at 409 South Maple Street, Unit B, Sapulpa, Oklahoma, Creek County,

Northern District of Oklahoma as further described in Attachment B, and for the

things described in Attachment C.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and

am authorized to request this search warrant because I am a government agent who

is engaged in enforcing federal criminal laws and I am within the category of officers

authorized by the Attorney General to request such a warrant.

3. I am a Special Agent with the Drug Enforcement Administration, United States Department of Justice, and as such, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), and Title 21, United States Code, Section 878(a). I have been a DEA Special Agent since July 2024 and am currently assigned to the DEA's Tulsa Resident Office.

4. Before becoming a DEA Special Agent, I completed a Bachelor of Science in Criminal Justice at Sam Houston State University in Huntsville, Texas. I also completed the DEA Academy in July 2024. During my studies at Sam Houston State University and the DEA Academy, I received instruction from professors and instructors with considerable experience investigating drug trafficking organizations globally. I have learned about different drug trafficking techniques and the methods and tactics that drug traffickers use to avoid detection and apprehension by law enforcement. During my career as a DEA Special Agent, as well as from my education, I have learned how people involved in distributing controlled substances maintain records of their distribution and conceal drug proceeds.

5. I have also received training focused on methods for unlawfully manufacturing illegal controlled substances in clandestine laboratories, installing and monitoring Global Positioning System (GPS) trackers, Title III wire interceptions, smuggling and distribution techniques, drug trafficking methods, the means that drug traffickers use to derive, launder, and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activity, and laws permitting the

2

forfeiture of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug trafficking violations.

6. During my career as a DEA Special Agent, I have used and become knowledgeable about various investigative techniques used to investigate drug trafficking organizations, including wire and electronic interceptions and other electronic surveillance methods, physical surveillance, undercover investigators and drug transactions, confidential sources and cooperating witnesses, controlled purchases of illegal controlled substances, consensually monitored recordings, trash searches, mail covers, search warrants, forensic extractions of cell phones seized from those involved in drug distribution, investigative interviews, administrative and grand jury subpoenas, and financial investigations. Through my training and experience, I have gained considerable knowledge about drug trafficking organizations and their members.

7. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, and conversations with others who have personal knowledge of the events and circumstances described herein. Because this affidavit is being submitted for the limited purpose of enabling a judicial determination of whether probable cause exists to justify the issuance of a search warrant, I have not included each and

3

every fact known to me and others regarding the investigation of this matter. I have set forth only the facts that I believe are necessary to establish probable cause.

8. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(viii) [Conspiracy to Distribute Methamphetamine] and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) [Possession of Methamphetamine with Intent to Distribute] will be located at 409 South Maple Street, Unit B, Sapulpa, Oklahoma, Creek County, Northern District of Oklahoma, as further described in Attachment A, and a gray Ford F150 bearing Oklahoma tag JSS055 as further described in Attachment B.

### Jurisdiction

9. "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

10. The requested search is related to the following violations of federal law:

    a. 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(viii) – Conspiracy to Distribute Methamphetamine; and

    b. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) – Possession of Methamphetamine with Intent to Distribute

11. Venue is proper because the person or property described in this affidavit is located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Drug Offenses Background

12.    During the course of my training and experience, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

13. Based on my background, training, and experience, as previously detailed in this affidavit, I know:

      a.   Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

      b.   Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

      c.   Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing drug activities;

      d.   Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks,

5

records of wire transfers, records of purchase of vehicles and property
and other papers relating to the importation, ordering, sale,
transportation, possession, purchase and transfer of controlled
substances;

e.  Drug traffickers often keep records that are usually recorded in units of
weight and monetary value, associated with pounds and kilograms or
other such units of measurement and dollar amounts to assist them in
their business, records to keep track of amounts "fronted" to customers
and money owed by customers for amounts "fronted" by the trafficker;
the aforementioned records, books, notes, ledgers, etc., are maintained
where drug traffickers have ready access to them, i.e., on their persons,
in their vehicles, in or about their residences and places of business.
These documents are often kept in code to secret their meaning from
law enforcement;

f.  It is common for drug traffickers to hide contraband, proceeds of drug
sales, financial instruments, precious metals, jewelry and other items of
value, and/or proceeds of drug transactions, records and evidence of
drug transactions relating to transferring, hiding or spending large sums
of money made from engaging in drug trafficking in secure locations on
their persons, within their vehicles, within or around their residences

6

and businesses for ready access or to conceal them from law
enforcement authorities;

g.  When drug traffickers collect proceeds from the sale of drugs, they
attempt to legitimize these profits. To accomplish these goals, drug
traffickers utilize some, if not all, of the following means; foreign and
domestic banks and their attendant services, securities, cashier's checks,
money orders, bank drafts, letters of credit, real estate, shell
corporations and business frauds;

h.  Drug traffickers commonly maintain names, addresses and telephone
numbers in books or papers for their associates in the trafficking
organization. These books or papers include such items as address
books, telephone messages, etc. Shorthand and/or code names are
sometimes used for buyers, co-conspirators, sellers, weights and other
details of the drug traffickers;

i.  Drug traffickers hide and maintain in their residences, storage buildings,
barns and outbuildings, places of business, family member's residences
and the residences of co-conspirators, financial records which, when
analyzed, will show their accumulation and expenditure of money and
assets substantially exceeds any legitimate income. I am aware that
courts have recognized that unexplained wealth is derived from crimes
motivated by greed, in particular, drug trafficking;

7

j. The books, records, receipts, notes, ledgers, and other items mentioned above are commonly maintained where the drug traffickers have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k. Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their products. These traffickers usually maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l. Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing drugs. This paraphernalia includes, but is not limited to, scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m. Drug traffickers frequently package illegal narcotics in vacuum sealed bags. Vacuum sealed bags help mask the smell of illegal narcotics, which assists drug traffickers with deterring law enforcement detection. Additionally, mid-level distributors frequently repackage the illegal narcotics they receive from their source of supply ("SOS") into smaller quantities.

n. Drug traffickers often keep handguns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard supplies of drugs and the proceeds of drug sales;

8

o. Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

p. Drug traffickers commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities;

q. Persons engaged in drug trafficking often carry and possess firearms during and in relation to and in furtherance of their crimes. They also photograph themselves and others with controlled substances, firearms, and money proceeds. Such photographs are often kept in digital form on cell phones. Individuals involved in drug trafficking also trade images of firearms and/or other items used in or derived from their illegal activity on their cell phones;

r. Those involved in domestic or international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and they

9

frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications;

s.  Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

t.  Individuals involved in illegal activities like drug trafficking often generate large amounts of cash from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of financial transactions to disguise and conceal profits. Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity. Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property or financial institutions.

14. Based on my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including, but not limited to, hard disk drives, floppy disks, thumb drives, compact disks,

10

magnetic tapes, memory chips, cellular telephones, iPads and other portable

electronic devices. I also know that during the search of a premises it is not always

possible to search computer equipment and storage devices for data for a number of

reasons, including the following:

      a.  Searching computer systems is a highly technical process which requires

specific expertise and specialized equipment. There are so many types

of computer hardware and software in use today that it is impossible to

bring to the search site all of the necessary technical manuals and

specialized equipment necessary to conduct a thorough search. In

addition, it may also be necessary to consult with computer personnel

who have specific expertise in the type of computer, software

application, or operating system that is being searched;

      b.  Searching computer systems requires the use of precise, scientific

procedures which are designed to maintain the integrity of the evidence

and to recover "hidden," erased, compressed, encrypted or password-

protected data. Computer hardware and storage devices may contain

"booby traps" that destroy or alter data if certain procedures are not

scrupulously followed. Because computer data is particularly vulnerable

to inadvertent or intentional modification or destruction, a controlled

environment, such as a law enforcement laboratory, is essential to

conducting a complete and accurate analysis of the equipment and

storage devices from which the data will be extracted;

c. Because of these facts, it is often necessary for computers, cellular

telephones, iPads and other portable electronic devices and all related

computer equipment to be seized during a premises search in order to

conduct a search by Forensic Examiners in the well-equipped and

controlled environment of a laboratory setting. If any electronic storage

device is seized during the search of the premises described in

Attachment A, a separate warrant will be sought before searching those

storage devices for data.

**Probable Cause**

15. On July 16, 2025, DEA Special Agent Kaitlyn Sanders received a phone call

from UPS Security Investigator David P. Ortega, who advised her that the UPS

Corporate Security Targeting Center Team contacted him for assistance in

intercepting a package that they suspected contained controlled substances. The

package's tracking number was 1Z92E3381295594998 and its destination address

was a home in the Northern District of Oklahoma (hereafter "the Subject Parcel").

The Subject Parcel was sent from Postal Plus, located at 3309 East Hillcrest

Boulevard in Inglewood, California.

16. On July 17, 2025, DEA investigators were notified that the Subject Parcel was

at a UPS Hub located at 5805 South 118th East Avenue in Tulsa. DEA investigators,

12

Oklahoma Highway Patrol Trooper Short, and Trooper Short's narcotics detector dog "Rip" responded to the UPS Hub. Trooper Short advised that "Rip" has been in service as a certified police narcotics detection dog since August 2023. According to Trooper Short, "Rip" holds an Oklahoma State certification number of 0136970-D004144 and is trained and certified to alert to the odors of heroin, cocaine, and methamphetamine. "Rip's" certification was administered by a State of Oklahoma Council on Law Enforcement Education and Training (CLEET) drug dog evaluator, certifying to Oklahoma's Canine Team standards. Per Trooper Short, he works regularly with "Rip," consistently and systematically verifying "Rip's" abilities to detect controlled substances.

17. At the UPS Hub, four boxes similar in size and the Subject Parcel were placed on the floor. Trooper Short ran "Rip" over the boxes and advised that "Rip" alerted (gave an odor response) on the Subject Parcel. An alert is an odor response indicating the odor of a controlled substance (heroin, cocaine, and/or methamphetamine) was emanating from the Subject Parcel. "Rip" did not alert on any of the other boxes. Trooper Short advised that based on "Rip's" alert, he believed the Subject Parcel contained illegal controlled substances.

18. On July 17, 2025, United States Magistrate Judge Christine D. Little signed a federal search warrant for the Subject Parcel. When investigators searched the Subject Parcel they determined it contained approximately 9,859.9 grams of a substance that agents recognized as physically consistent with methamphetamine.

13

DEA investigators tested the substance using a TruNarc kit and received a presumptive positive result for the presence of methamphetamine.

19. On July 18, 2025, DEA investigators conducted a controlled delivery of the Subject Parcel to the address within the Northern District of Oklahoma that it was being shipped to. During the controlled delivery, investigators saw a person within the home take the Subject Parcel into the home. DEA investigators subsequently executed a federal anticipatory search warrant on the home. During that warrant operation, investigators contacted the person who received the Subject Parcel into the home.

20. While DEA investigators searched the aforementioned home, Task Force Officers Evan Foster and David Brice, and Special Agent Kaitlyn Sanders, saw a gray Ford F150 bearing Oklahoma tag #JSS055 directly parked in front the driveway of the home. The vehicle was registered to Christien Lafrance at 409 South Maple Street, Unit B, in Sapulpa, Oklahoma. After several minutes of the grey Ford F150 being directly parked in front the driveway of the home, DEA investigators approached the vehicle, contacted the white male driver, and identified him as Christien Lafrance. Lafrance was the only person in the grey Ford F150

21. During the encounter, Lafrance asked investigators who they were and what they were doing at the home. Lafrance then said he was there to meet a landlord at the address to look at the property. Lafrance said he might have the wrong house. Special Agent Sanders asked Lafrance to see his cell phone to see who he was

14

meeting and Lafrance quickly changed the subject. Lafrance then confirmed with investigators that the address investigators were searching was in fact the same house number he was looking for.

22. Lafrance told investigators he worked at Valve Sales Inc.[1] Special Agent Sanders saw that Lafrance's shirt had the logo for that company on it. Lafrance also told investigators he originally came from Texas. When investigators asked Lafrance if he had ever been in trouble, Lafrance replied that he got in trouble in the 1990s for cocaine and marijuana.

23. Special Agent Sanders asked Lafrance to look at the maps application or messages on his cell phone to see what address he was looking for. Lafrance refused the request. Lafrance gave investigators the name of the person he claimed he was looking for, but investigators were unfamiliar with the name.

24. Task Force Officer Brice asked Lafrance to see his driver's license, which Lafrance provided. Lafrance told investigators he would "get out of their hair." According to Special Agent Sanders, Lafrance appeared very nervous during the interactions. She noted that his voice was strained, he hesitated before answering questions, and he avoided making eye contact with the investigators. While reviewing Lafrance's driver's license, investigators saw that it pictured Lafrance and listed the address 409 South Maple Street, Unit B, Sapulpa, Oklahoma 74066.

---

[1] During this investigation, I determined that Valve Sales Inc. is located at 4344 South Maybelle Avenue in Tulsa, Oklahoma.

25. While DEA investigators spoke with Lafrance outside of the home, other investigators were interviewing the occupant of the home[2] who received the Subject Parcel. That interview occurred in a vehicle nearby. Investigators showed the occupant of the home a picture of the driver's license that Lafrance had given TFO Brice (Lafrance's driver's license) and the occupant told investigators that the person on the driver's license was the person who was supposed to pick up the Subject Parcel from the home. The occupant said that Lafrance picked up packages at the home approximately twenty times.

26. The occupant of the home said that he/she initially met Lafrance at a casino. After knowing each other for approximately five or six months, Lafrance talked to the occupant about making some money. The occupant said Lafrance told him/her that Lafrance needed a house to have packages sent to. Lafrance told the occupant that the packages would contain something "illegal." The occupant said that Lafrance advised he would call the occupant the day the package was due to arrive and advise the occupant that a package was arriving. Then, Lafrance would come and pick up the package and give the occupant cash.

---

[2] The occupant of the home was advised that he/she could potentially be arrested and prosecution in connection with receipt of the Subject Parcel. The occupant agreed to speak with DEA investigators in exchange for potential consideration related to his/her potential arrest and prosecution. However, investigators did not make any promises to the occupant of the home. To protect the occupant of the home's identity, I will refer to them as "the occupant" or "the occupant of the home" throughout this affidavit.

16

27. The occupant showed DEA investigators text messages between him/her and Lafrance. From training and experience, investigators observed conversations that were consistent with drug conversation. They also saw messages consistent with Lafrance coming to the home to pick up packages.

28. Using a law enforcement database, I checked Lafrance's criminal history and determined he was previously arrested for delivery of a controlled substance, possession of cocaine, possession of marijuana, and unlawfully carrying a weapon in 1991. I also learned Lafrance was previously arrested for conspiracy to distribute a controlled substance and conspiracy to distribute marijuana in 2007.

29. From training and experience, I know that drug traffickers commonly use mail delivery services, such as UPS, to ship illegal controlled substances to co-conspirators elsewhere in the United States. Drug traffickers also use mail delivery services to ship proceeds derived from the distribution of illegal controlled substances. I also know from my training and experience that drug traffickers sometimes ship packages containing controlled substances to residences other than their own. The drug traffickers then collect the package from the residences and pay the true homeowner for allowing the drug trafficker to use their address. Drug traffickers employ this tactic in an effort to hinder law enforcement's ability to identify them and their true home. Additionally, drug traffickers often use multiple residences as part of the aforementioned tactic in an attempt to hinder law enforcement's ability to intercept and seize all of their drug shipments, link the drug

17

trafficker to a particular location, and shut down the trafficker's ability to receive illegal controlled substances via parcel carriers by targeting a single residence.

30. On August 6, 2025, United States Magistrate Judge Mark T. Steele of the Northern District of Oklahoma signed an order and affidavit authorizing investigators to install and monitor a GPS tracking device on the gray Ford F150 bearing Oklahoma tag #JSS055, which investigators previously saw Christien Lafrance driving. Investigators installed and began monitoring a GPS tracker on that F150 on August 6, 2025.

31. On August 7, 2025, I reviewed historical GPS location data from the tracking device installed on the F150. That data showed that on August 6, 2025, at approximately 3:47 p.m., the F150 left Valve Sales Inc. on Maybelle Avenue in Tulsa (Lafrance's place of work) and drove to a strip of businesses located at Wekiwa Road and North Wilson Avenue in Sand Springs. The F150 stayed at that strip of businesses until approximately 5:09 p.m. It then drove directly to SecureCare Self Storage, located at 3655 South Tacoma Avenue in Tulsa. At approximately 5:58 p.m., the F150 left the SecureCare Self Storage and made three separate stops at residences located within the Northern District of Oklahoma. Immediately after those stops, on the morning of August 7, 2025, at approximately 1:27 a.m., the F150 arrived at 409 South Maple Street, Sapulpa, Oklahoma (the address listed on Lafrance's driver's license and associated with the F150's registration). The GPS tracker activity showed that the F150 remained at 409 South Maple Street in Sapulpa

18

until approximately 9:13 a.m. on August 7, 2025. Based on the duration of that stop and the facts described herein, I believe that the stop was consistent with Lafrance staying overnight at 409 South Maple Street, which I believe is consistent with him residing there.

32. On August 7, 2025, DEA TFO James Dawson contacted a SecureCare Self Storage employee regarding the F150 stopping at their storage facility location at 3655 South Tacoma Avenue in Tulsa. The employee provided storage rental records showing that Christien Lafrance rents Unit 389 at that location and has been renting it for the past six months. The address listed for Lafrance on those records is 409 South Maple Street, Unit B, Sapulpa, Oklahoma 74066.

33. Based on my training and experience, I know that individuals involved in drug distribution frequently keep stashes of illegal controlled substances at storage facilities for security and to attempt to prevent law enforcement from locating and seizing those controlled substances, and linking the individual to narcotics distribution, should law enforcement execute a search warrant at an individual's home. Therefore, from my training and experience, the information about Lafrance set forth in this affidavit, and the pattern of GPS tracker activity described above, I believe that Lafrance picked up illegal controlled substances from a storage at SecureCare Self Storage and distributed them to the three aforementioned homes.

34. During this investigation, I determined that 409 South Maple Street is a duplex with units A and B. The structure is a single story and the units are side-by-side. Each unit has its own garage door.

35. During this investigation, DEA investigators spoke with a Tulsa Police Officer about Lafrance. DEA investigators learned that Lafrance was previously the target of a Tulsa Police investigation. The TPD officer confirmed that during that investigation, Tulsa Police officers surveilled Lafrance enter the front door to 409 South Maple Street, Unit B, multiple times. The TPD officer also confirmed that Tulsa Police officers also surveilled Lafrance entering the garage door associated with Unit B.

36. Based on the foregoing, and from my training and experience, I believe that Lafrance resides at 409 South Maple Street, Unit B, Sapulpa, Oklahoma 74066, as further described in Attachment A, and that the items described in Attachment C will be located there.

37. Further, based on the foregoing, and from my training and experience, I believe that Lafrance drives a gray Ford F150 bearing Oklahoma tag JSS055 located at 409 South Maple Street, Unit B, Sapulpa, Oklahoma, Creek County, Northern District of Oklahoma, as further described in Attachment B, and that the items described in Attachment C will be located there.

## Conclusion

38. Based on the information above, I submit that there is probable cause to search 409 South Maple Street, Unit B, Sapulpa, Oklahoma, 74066, Creek County, Northern District of Oklahoma as further described in Attachment A, and a gray Ford F150 bearing Oklahoma tag JSS055, Creek County, Northern District of Oklahoma as further described in Attachment B, and seize the items described in Attachment C.

39. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

_____
Special Agent Wyatt Huffman
Drug Enforcement Administration

Subscribed and sworn to by phone on August ___, 2025.

_____
JUDGE MARK T. STEELE
UNITED STATES MAGISTRATE JUDGE

21

## ATTACHMENT A

### Property to be Searched

The property to be searched is a residence located at 409 South Maple Street, Unit B, Sapulpa, Oklahoma 74066, Creek County, Northern District of Oklahoma, further described as a single unit within a duplex located in the 400 block of South Maple Street, Sapulpa, Oklahoma. The duplex is the third structure north of East Bryan Avenue and is located on the east side of South Maple Street. The duplex is constructed of residential white siding and a composite shingle roof. The numbers '409' are affixed to the west side of the residence. Unit B's front door is in a recessed area and is not visible from the street. The letter 'B' is affixed to the residence's west garage door. The property to be searched is more commonly known as 409 South Maple Street, Unit B, Sapulpa, Oklahoma, Creek County, and is located within the Northern District of Oklahoma and pictured below.



## ATTACHMENT B

### Property to be Searched

The vehicle to be searched is a gray Ford F150 bearing Oklahoma tag JSS055, registered to Christien Lafrance at 409 South Maple Street, Unit B, Sapulpa, Oklahoma 74066, Creek County, Northern District of Oklahoma. The vehicle is located at South Maple Street, Unit B, Sapulpa, Oklahoma 74066 and is pictured below.



## ATTACHMENT C

## Description of Items to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of violations of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(viii) [Conspiracy to Distribute Methamphetamine] and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) [Possession of Methamphetamine with Intent to Distribute], including:

a. Documents showing ownership of real property described in Attachment A;

b. Proof or ownership of the vehicle described in Attachment B

c. United States Currency or items reflecting drug proceeds;

d. Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data.

e. Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

f.   Items of personal property tending to establish the existence of a narcotics conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

g.   Paraphernalia for distributing, packaging and weighing narcotics. Equipment and materials used in the building or using concealed compartments;

h.   Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

i.   Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

j.   Records and items reflecting travel for the purpose of participation in drug trafficking including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

k.   Any and all appointment calendars;

l.   Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial

2

transactions including the purchase of real estate and documents showing ownership of real estate;

m. Records relating to employment, wages earned and paid and other compensation records. Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

n. Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly: financial records of withdrawals, funds of transfers, purchases, sales, transfers of assets or consolidation of assets. Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

o. Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

p. Cellular telephones including electronically stored data on said telephones or other electronic storage devices such as PDA's or electronic organizers; electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon.

3

q. Computers and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device;

r. Firearms, ammunition and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

s. Records related to the rental and/or leasing of storage units, including but lease agreements, rental and/or lease records, receipts, and payment records;

t. Records related to the shipping and receiving of materials via mail delivery services including UPS, FedEx, and USPS, and other mail carriers, including shipping records, delivery confirmation records, receipt/delivery slips, payment receipts, and documents containing tracking information;

u. Vehicle registration records including the gray Ford F150 bearing Oklahoma tag JSS055 and any other vehicles parked at 409 South Maple Street, Sapulpa, Oklahoma that may establish dominion and control over such vehicles.

4

If any electronic storage device, such as those listed in paragraphs (o) and (p), is seized during the search of the premises, a separate warrant will be sought before searching those storage devices for data.